IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ERIK C. STRICKLAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:14-CV-962-NJR-DGW** |
| | ) | |
| **SALVADOR GODINEZ, TY BATES,** | ) | |
| **DONALD GAETZ, STEVE KEIM,** | ) | |
| **MARC HODGE, STEVE DUNCAN,** | ) | |
| **BETH TREDWAY, DAVID VAUGHN,** | ) | |
| **JERRY HARPER, and WILLIAM LOY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court are cross motions for summary judgment filed by the parties (Docs. 102, 131).[1] For the reasons set forth below, Defendants' motion is granted, and Plaintiff's motion is denied.

### INTRODUCTION

Plaintiff Erik C. Strickland, an inmate of the Illinois Department of Corrections ("IDOC") filed this lawsuit on September 3, 2014 (Doc. 1), pursuant to 42 U.S.C. § 1983, alleging he was being denied the opportunity to practice various aspects of his religion, Asatru/Odinism, while incarcerated at Lawrence Correctional Center. Strickland named various prison officials as defendants, including: Salvador Godinez, IDOC Director from 2012 to 2015; Ty Bates, IDOC Deputy Director from 2012 to 2013; Donald Gaetz, IDOC

---

[1] The Clerk of Court is **DIRECTED** to modify the spelling of Defendants' names in the docket as contained in the caption above.

Deputy Director from 2013 to 2014; Stephen Keim, IDOC Chief Chaplain from 2012 to present; Marc Hodge, Warden of Lawrence from 2012 to 2013; Steven Duncan, the Warden of Lawrence at the time of filing; Beth Tredway, Assistant Warden of Programs from 2012 to 2015; David Vaughn, IDOC Chaplain from 2012 to present; Jerry Harper, Correctional and Intelligence Officer; and William Loy, Correctional and Intelligence Officer. Strickland is proceeding on three counts: Count 1 alleges claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), against IDOC administrators; Count 2 alleges the same RLUIPA claims against Lawrence officials; and Count 3 alleges First Amendment claims against Intelligence Officers Loy and Harper related to Strickland's desire to engage in group worship (Docs. 8, 85).

Defendants filed a motion for summary judgment on April 6, 2016 (Doc. 102). Strickland filed a *pro se* response on June 22, 2016 (Doc. 123), which was withdrawn by assigned counsel (Doc. 124). Strickland, through counsel, then filed a combined response and cross-motion for summary judgment (Doc. 131). Defendants have not filed a response to the cross-motion.

In their motion for summary judgment, Defendants argue that they were not personally involved in any alleged violation of Strickland's rights, that Strickland cannot show that the exercise of his religion was substantially burdened, that they have a compelling governmental interest in imposing a burden on his religious practice, and that they are entitled to qualified immunity. Strickland concedes that the § 1983 claims contained in Count 1 should be dismissed for lack of personal involvement; however, he

argues that his religious practice was substantially burdened, that the prison did not impose the least restrictive means, that the prison had alternative means to advance its legitimate penological interests, and that qualified immunity is limited to Strickland's claims for monetary relief under § 1983.

BACKGROUND

Strickland is a practicing member of the Asatru religion, also known as Odinism. As part of his religious observance, he has requested various items in his cell, including an altar cloth, a rune set, a second medallion, a wooden drinking horn, a wooden sacramental bowl, and an adorned alter, among other things (Plaintiff's Statement of Undisputed Fact ("PSUF") ¶17, Doc. 131, pp. 3-6). These items are used in both individual and group worship, although group worship also requires "sacred land" and a "wooden Thor's hammer" (PSUF ¶ 15). Group worship was allowed at Lawrence, in part because of Strickland's advocacy, beginning on July 19, 2013 (PSUF ¶ 12). Defendants Harper and Loy supervised and monitored the group services (PSUF ¶ 13). However, group worship was cancelled in June 2015 (PSUF ¶14). Strickland also observes Blót, a ritual observation of thirteen holy days, five of which include ritual feasting (PSUF ¶ 16).

While at Lawrence, Strickland has been denied a second medallion (despite IDOC rules allowing inmates to possess two medallions), all items for individual and group worship, and the ability to celebrate all thirteen Blóts (Strickland has been permitted to celebrate only two Blóts) (PSUF ¶¶ 18-21). The prison also has substituted alternative items for those desired by Strickland, but according to Strickland the substitutions are

"made from material that does not align with Asatru beliefs and values" (i.e. plastic bowls and cups for their wooden counterparts) (PSUF ¶ 21). Defendant Vaughn is the Chaplain at Lawrence who has authority over religious services, items, and practices (Defendants' Statement of Undisputed Material Facts ("DSUF") ¶ 9). Defendant Keim is IDOC's Chief Chaplain (DSUF ¶ 45).

It is undisputed that security threat groups ("STGs"), i.e., gangs or unauthorized organizations in prison, pose a significant risk to inmate and jail officials' health, safety, and security (DSUF ¶ 15, Doc. 103-1).[2] STGs pose a threat by violating various prison rules, trading and trafficking in contraband, exploiting offenders, participating and ordering assaults on inmates and staff, exhibiting extreme acts of violence, and participating or conducting illegal activity. (DSUF ¶ 15). One such STG at Lawrence is the white supremacists group (DSUF ¶ 18). STGs can use religious activity, and in particular have used the Asatru religion, as a "guise for white supremacist STG activity" (DSUF ¶ 20). Strickland himself admits that people who identify with white supremacists use Odinism as a "cover" (Doc. 103-3, p. 91). Strickland denies affiliation with a gang or any involvement in STG activity, however, and he does not associate Asatru with violence (PSUF ¶ 25).

It is also undisputed that Strickland was transferred to Lawrence from Shawnee Correctional Center in 2012 due to a disciplinary infraction for STG activity (DSUF ¶ 21). In particular, prison officials were informed that Strickland was the mastermind in

---

[2] Much of the DSUF contains no citation to the record. The facts appear to be verbatim recitations of the information found in the various affidavits attached to Defendants' memorandum (Doc. 103). Strickland does not challenge the assertions made in the DSUF; the Court will therefore refer to the DSUF (and not the underlying affidavits).

recruitment activities for the white supremacist group at Shawnee, which was orchestrated under the cover of group Asatru/Odinism worship (DSUF ¶ 24). Strickland admitted to officials at Shawnee that he was affiliated with the white supremacists. Strickland also has various tattoos demonstrating his affiliation: an embellished swastika, the number 1488,[3] and the letters "WP" in reference to "white power" (DSUF ¶ 23).

Because of Strickland's history, he was monitored by the Intelligence Unit at Lawrence for continued STG activity (DSUF ¶¶ 22-23). Defendant Harper worked in the Intelligence Unit in some capacity during the relevant time period; he is currently the Intelligence Unit Coordinator at Lawrence (DSUF ¶ 12). Defendant Loy was an Intelligence Officer in 2012 and is currently a Correctional Sergeant (DSUF ¶ 10). Defendants Harper and Loy were assigned to monitor and investigate Strickland's conduct (DSUF ¶¶ 25, 26, 35). Strickland claims Defendants Harper and Loy threatened him while he was in the chow line after he filed grievances regarding the denial of his right to practice Asatru, insinuating that if he participated in his group worship services, he would receive a STG ticket (Doc. 103-3, p. 46). As a result, Strickland claims, he did not fully participate in group worship services (Doc. 103-3, p. 47).

After consulting with the Intelligence Unit, Chaplain Vaughn denied Strickland's request for various religious items because they contained symbols associated with white supremacists or were considered safety and security threats (DSUF ¶ 52). For

---

[3] The number 14 represents the 14-word, white power mission statement, and the number 88 represents "Heil Hitler."

example, a requested red and white altar cloth had a swastika on it (DSUF ¶ 29);[4] the additional medallion Strickland requested had a sun wheel on it (which is deemed to represent a swastika) (DSUF ¶ 30);[5] and a book, "The Handbook of the Ulfhednar Kindred of Asatru," contained white supremacist imagery including a tree with a noose hanging from a branch (DSUF ¶ 41).[6] Strickland was denied the option of keeping a rune set in his cell because they had been used by other inmates to "manipulate other offenders to commit assaults or violence . . . ." (DSUF ¶ 59). Strickland was nonetheless permitted to keep a set in the chapel for use during group worship or during scheduled visits to the chapel (DSUF ¶ 59). Wooden objects, like the requested drinking horn, bowl, and a staff, were rejected because they could be fashioned into weapons (DSUF ¶ 60-61). Strickland was given plastic bowl and cup alternatives (*Id.*).[7] The in-cell "adorned" alter was rejected because it would not fit into a property box (where inmates are directed to keep their personal property) and would obscure a view of the cell (DSUF ¶¶ 63-64). However, Strickland was permitted to adorn his bed or shelf in his cell and worship individually as an alternative (*Id.*). He also was allowed to create a Thor's Hammer, oath ring, staff, and sunwheel out of cardboard (DSUF ¶¶ 78-79).

The limitations on Strickland's celebration of Blót were unrelated to Odinism or Strickland's history of involvement in white supremacist groups. Chaplain Vaughn was required to accommodate 43 different religions practiced by Lawrence inmates, and all

---

[4] Strickland was permitted to use a plain, solid-color alter cloth (DSUF ¶ 66).
[5] Strickland was permitted the opportunity to request an alternative (DSUF ¶ 67).
[6] This "book" appears to be a type-written document co-authored by Strickland (Doc. 103-16).
[7] Strickland also was permitted to create certain items with cardboard (DSUF ¶78). Other items were not made available like alcohol and candles (DSUF ¶¶ 77, 80).

religions were limited to two religious holidays due to limited resources, scheduling, and security concerns (DSUF ¶ 68-69). Strickland's request for "sacred land" was denied "for safety, security, and economic concerns" because "Lawrence does not have sacred land to donate" to Strickland (DSUF ¶ 74). Strickland's request to convene with a group outside of the chapel to conduct certain ceremonies also was denied because of inmate movement (a number of inmates would be moving around the facility at the same time creating a security concern) (DSUF ¶¶ 83-4).

Lawrence officials did, however, allow group worship consistent with the requirements of the Illinois Administrative Code. In particular, because there was no chaplain who was available to lead such services, the group needed pre-approval and a staff person to attend and monitor (DSUF ¶¶ 32-33). When Strickland's worship group was monitored by an intelligence officer, the group "followed the approved service or sermon as required by the Department rule" (DSUF ¶ 36). When an intelligence officer was not present, however, Strickland "and two individuals would have their own separate discussions during services" (DSUF ¶ 37).

After group services began, additional inmates, uniformly white, began identifying as Asatru (DSUF ¶ 38). Strickland solicited help from persons not incarcerated to conduct background checks on these new individuals in order to ensure that none had sex offenses (sexual offenders are not welcomed by white supremacists) (DSUF ¶ 40). Strickland also sought to incorporate "parliamentary procedure[s]" to the group worship (DSUF ¶ 45). This conduct raised flags for prison officials of potential white supremacist activity, and group worship was suspended (DSUF ¶ 39).

**LEGAL STANDARD**

Cross motions for summary judgment are treated separately under the standards applicable to each. *See McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005).

The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of

fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

## DISCUSSION

Prior to reaching the merits of Strickland's claims, the proper parties should be clarified. Strickland has brought claims under RLUIPA, which limits damages to injunctive or declaratory relief, *see Sossamon v. Texas*, 563 U.S. 277, 287 (2011). The proper parties in a claim for injunctive relief are the supervisory government officials responsible for ensuring that the injunctive relief is carried out. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Thus, the only proper defendants with regard to Strickland's RLUIPA claims are IDOC Director Godinez (Count 1), Chief Chaplain Keim (Count 1), Warden Nicolas Lamb (who will be substituted for Warden Duncan in Count 2),[8] and Chaplain Vaughn (Count 2). *See, e.g., Gonzalez*, 663 F.3d at 315. Strickland's RLUIPA claims against Defendants Bates, Gaetz, Hodge, Duncan, and Tredway are inapplicable because those Defendants have no power to enforce injunctive relief. *Maddox v. Love*, 655 F.3d 709, 717 (7th Cir. 2011); *Nelson v. Miller*, 570 F.3d 868, 884–89 (7th Cir. 2009). Accordingly, Defendants Bates, Gaetz, Hodge, Duncan, and Tredway will be dismissed only as to Strickland's RLUIPA claims in Counts 1 and 2.

Strickland concedes that his First Amendment claims contained in Counts 1 and 2 against Defendants Godinez, Bates, Gaetz, and Hodge should be dismissed because they

---

[8] Warden Lamb has replaced Steve Duncan as the current Warden at Lawrence.

lacked personal involvement.[9] "Section 1983 does not authorize 'supervisory liability.'" *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). For supervisors like Defendants to be liable under 42 U.S.C. § 1983, "they must be personally responsible for the deprivation of the constitutional right." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citations omitted). To be personally responsible, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (citations omitted). In light of Strickland's concession, Defendants Godinez, Bates, and Gaetz are entitled to judgment as a matter of law as to Strickland's First Amendment claim in Count 1, as is Defendant Hodge who is named in Strickland's First Amendment claim in Count 2. Furthermore, Strickland has presented no evidence that Defendants Duncan or Tredway were personally involved in any constitutional deprivation. They also are entitled to judgment on Strickland's First Amendment claim in Count 2.

In light of these dismissals, Strickland is proceeding on his RLUIPA claims against Godinez and Keim (Count 1) and Lamb and Vaughn (Count 2) and his free exercise claims under the First Amendment against Keim (Count 1), Vaughn and Loy (Count 2), and Loy and Harper (Count 3).

**First Amendment and RLUIPA claims**

Both the Free Exercise Clause of the First Amendment and RLUIPA protect an

---

[9] However, Strickland states that he sent unanswered letters "detailing the limitations on his religious practice and his contention that the denial of Asatru services and religious objects was a violation of his right to freely practice his religion," to Godinez, Bates, Hodge, and Gaetz (Doc. 131, p. 6). Strickland does not elaborate or make any argument as to how these letters would make these Defendants personally liable; therefore, the Court declines to address any such claim. Even if Strickland has some evidence of personal involvement related to these individuals, for the reasons set forth below, they would nonetheless be entitled to judgment.

inmate's right to practice his or her religion. Specifically, the Free Exercise Clause prohibits a prison from imposing a "substantial burden" on a "central religious belief or practice," unless the burden is reasonably related to a legitimate penological objective. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). A rule impinging on this right "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Legitimate penological interests include the preservation of security in the prison, as well as economic concerns. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 352-53 (1987); *Turner*, 482 U.S. at 90; *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009); *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991).

Restrictions on access to religious services and other opportunities are reviewed under the four *Turner* factors: (1) whether there is a valid and rational connection between the regulation prohibiting access and a legitimate governmental interest to justify it; (2) whether there are alternative means of exercising the right to practice religion that remain open to inmates; (3) whether accommodation of the right to practice would have a significant impact on prison staff or other inmates; and (4) whether the regulation is reasonable in terms of allowing prisoners use of available alternatives. *Turner*, 482 U.S. at 78; *see also Beard v. Banks*, 548 U.S. 521 (2006).

RLUIPA imposes a higher standard and prohibits a prison from imposing a "substantial burden" on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). The statute provides that "[n]o government shall impose a substantial burden on the religious

exercise of a person residing in or confined to an institution. . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "In establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion." *Koger*, 523 F.3d at 796 (citing 42 U.S.C. § 2000cc–2(b)). Defendants then "bear the burden of persuasion on any [other] element of the claim," namely whether their practice "is the least restrictive means of furthering a compelling governmental interest." *Id.* (quoting *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006)).

Notably, money damages are not available to a plaintiff under RLUIPA. *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) (citing *Sossamon v. Texas*, 563 U.S. 277 (2011)) ("money damages are not available in suits against states under the RLUIPA—and suits against state employees in their official capacity are treated as suits against the states themselves"); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009)); *Grayson v. Schuler,* 666 F.3d 450, 451 (7th Cir. 2012). Furthermore, even if a prison official is sued in his or her personal capacity, "RLUIPA does not authorize any kind of relief against public employees, as opposed to governmental bodies that receive federal funds and accept the conditions attached by the statute." *Id.*

Because RLUIPA provides greater protection than that provided by the First

Amendment, the Court first addresses those claims. Should Strickland fail on those claims, it will be unnecessary to address the free exercise claims. *See Koger*, 523 F.3d at 801 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) ("federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions")); *see also Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (declining to consider a prisoner's constitutional claims, and considering solely his RLUIPA claim after noting the heightened protections it offers); *Kaufman v. Schneiter*, 474 F. Supp. 2d 1014, 1025 (W.D. Wis. 2007) ("The protections offered by the First Amendment are more limited than those extended under RLUIPA. Therefore, any claim that fails under RLUIPA will fail inevitably under the First Amendment . . . .").

The Court begins its analysis by asking whether Strickland's religious beliefs were substantially burdened by the denial of various religious items, restriction on the celebration of all religious holidays, and the cancellation of group services. A substantial burden is one that "seriously" violates or contradicts an inmate's religious beliefs. *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015) (citing *Holt v. Hobbs*, 135 S.Ct. 853 (2015) and *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014)). "[T]o ensure that prison policies further that compelling interest, a stated security concern must be "grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations." *West v. Grams*, 607 F. App'x 561, 567 (7th Cir. 2015).

Here, no jury would find that Strickland's religious exercise was substantially burdened such that he was compelled to modify his behavior and contradict his beliefs

or that any of the restrictions "seriously" violated his beliefs. First, there is no showing that any defendant compelled Strickland to prove that various items, ceremonies, or types of worship were central to or required by his religion. *See, e.g.*, *Nelson v. Miller*, 570 F.3d, 868, 878-79 (7th Cir. 2009) (requiring an inmate "to show that his religion compelled the practice in question and to verify that compelled practice with documentation" was a substantial burden). And yet the only evidence that any prohibited item or ritual was important to Strickland's exercise of religion is his "unreasoned say-so." *See Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (holding there was no material dispute requiring a trial where no objective evidence supported the plaintiff's assertion that certain books were important to Odinism); *Smith v. Governor of Alabama*, 562 F. App'x 806, 813 (11th Cir. 2014) (finding that a plaintiff had to do more than show that the denial of religious items was an inconvenience).

Strickland cites only to his belief that because his religion is "a nature religion," the use of unnatural substances like plastic or Styrofoam cups and bowls in religious ceremonies "is just, you know, almost sacrilegious, you know" (Doc. 103-3, pp. 61-62). There are no other citations to the record about how the denial or modification of other items, holidays, or types of worship (i.e., individual vs. group worship) substantially burdened Strickland's free exercise of religion. Based on this lack of evidence of any substantial burden, Strickland's claims must fail as a matter of law.

Assuming for the sake of argument that Strickland *could* show there was a substantial burden on the exercise of his religion, the Court must analyze whether that substantial burden furthers a compelling government interest by the least restrictive

means. *See Koger*, 523 F.3d at 796 (RLUIPA prohibits a prison from imposing a "substantial burden" on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means."). While Strickland admits that the prison has compelling safety and security concerns, he argues that the restrictions imposed on him were not the least restrictive means available.

The Court disagrees. The alternatives offered to Strickland were the least restrictive means of furthering the prison's compelling interest in institutional safety and security, especially considering Strickland's history of advocating for, recruiting for, and participating in white supremacist activity under the guise of his religion. The items that Strickland required for individual worship were made available in the chapel, including the runes, altar cloth, and wooden items used for individual worship. Strickland also was allowed to possess alternatives to the wooden items in his cell. He was permitted to order alternatives for items that contained white supremacist symbols, including a plain alter cloth and another personal religious item instead of a medallion containing a sun wheel. Strickland, like all other inmates, was permitted to celebrate two holy days. Defendants clearly accommodated Strickland's religion—while also preserving institutional safety and security—in the least restrictive way possible. If an inmate's "request [ ] for religious accommodations become[s] excessive, impose[s] unjustified burdens on other institutionalized persons, or jeopardize[s] the effective functioning of an institution, the prison [is] free to resist the imposition." *Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005).

The prison also, however, suspended group worship and prevented or prohibited certain group worship activities (like moving to an outside location and maintaining "sacred grounds" for the Odinists' use). The question before the Court is whether the cancellation of group services because of suspected STG activity was the least restrictive means of advancing the prison's legitimate security concerns.

The answer could be no. *See West v. Grams*, 607 F. App'x 561, 566-568 (7th Cir. 2015); *Greene v. Solano Cty. Jail*, 513 F.2d 982, 987 (9th Cir. 2008) (finding it was a question of fact whether an outright ban on group worship was the least restrictive means). Defendants admit that when a monitor such as Defendant Loy or Defendant Harper was present during group worship, the group's conduct conformed to expected religious adherence. Defendants also provide some evidence that inmate movement was hampered by the necessity of ensuring that religious items remained in the chapel after group services, but this appears to be a logistical issue rather than one involving security. Thus, for a typical adherent of Odinism, an outright ban on group worship may violate RLUIPA and lead to injunctive relief.

As to Strickland, however, the conclusion cannot be made in a vacuum and without reference to his specific conduct. *See* 42 U.S.C. § 2000cc-1(a) (stating defendants must "demonstrate [ ] that imposition of the burden on *that* person . . . is the least restrictive means of furthering [a] compelling governmental interest" (emphasis added)). The evidence in this case points to Strickland's plan to use group worship as a cover for recruiting white supremacists rather than engaging in religious activity. Strickland was sent to Lawrence because he was recruiting other inmates into his white

supremacist group. He has tattooed his body with white supremacist symbols and numerology. He has requested items containing white supremacist symbols and images. He was observed using group services to have conversations with other inmates outside of the parameters of the services. He requested books that set forth a hierarchical system antithetical to prison security. He sought background checks on proposed members of group worship to ensure they were not sex offenders—a characteristic that is relevant to membership in white supremacist groups. Indeed, Strickland's attempts at recruitment appear successful: the prison noted an uptick in white inmates identifying as Odinists and seeking participation in group services.

In this instance, and with Strickland's specific conduct in mind, prison officials are entitled to deference with regard to prison security. *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (noting that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" and that it must be applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources"); *see also Salahuddin v. Goord*, 467 F.3d 263, 277-278 (2nd Cir. 2006) (stating that a lack of evidence regarding a specific inmate's threat to safety and security could make an outright ban on his ability to participate in group worship contrary to the free exercise clause). While another inmate who practices Odinism may prevail on such a claim, in this case no jury would find that restricting Strickland from group worship activity was not the least restrictive means of advancing a compelling governmental interest.

Because Strickland has failed on his RLUIPA claims, it is unnecessary to examine his claim regarding free exercise under the First Amendment, except to note that Defendants would be entitled to qualified immunity on Strickland's group worship claim against Defendants Harper and Loy. *See West*, 607 F. App'x at 565 ("It has never been clearly established that inmates have a right to inmate-led group worship under the First Amendment.").

CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Defendants (Doc. 102) is **GRANTED**, and the Motion for Summary Judgment filed by Plaintiff Erik C. Strickland (Doc. 131) is **DENIED**. Warden Nicholas Lamb is hereby **SUBSTITUTED** for Defendant Duncan as to Strickland's RLUIPA claim in Count 2. Defendants Bates, Gaetz, Hodge, Duncan, and Tredway are **DISMISSED** as to Strickland's RLUIPA claims in Counts 1 and 2. Defendants Godinez, Keim, Lamb, Vaughn, Loy, and Harper are **DISMISSED with prejudice.** The Clerk of Court is **DIRECTED** to enter judgment accordingly.

IT IS SO ORDERED.

DATED:   March 20, 2017

**NANCY J. ROSENSTENGEL**
**United States District Judge**